# IN THE SUPREME COURT OF CALIFORNIA

PRESBYTERIAN CAMP AND CONFERENCE
CENTERS, INC.,
Petitioner,
v.
THE SUPERIOR COURT OF SANTA BARBARA COUNTY,
Respondent;
DEPARTMENT OF FORESTRY AND FIRE PROTECTION,
Real Party in Interest.

S259850

Second Appellate District, Division Six
B297195

Santa Barbara County Superior Court
18CV02968

December 27, 2021

Justice Groban authored the opinion of the Court, in which
Chief Justice Cantil-Sakauye and Justices Corrigan, Liu,
Kruger, Jenkins, and Mauro, J.* concurred.

_____

\*     Associate Justice of the Court of Appeal, Third Appellate
District, assigned by the Chief Justice pursuant to article VI,
section 6 of the California Constitution.

PRESBYTERIAN CAMP AND CONFERENCE CENTERS,
INC. v. SUPERIOR COURT

S259850


Opinion of the Court by Groban, J.


In June 2016, a wildfire burned nearly 7,500 acres of land across Santa Barbara County. Federal, state, and local authorities dispatched over 2,000 fire fighters to battle the blaze (designated the Sherpa Fire) and to protect the people and property it jeopardized. The California Department of Forestry and Fire Protection (CalFire) spent over $12 million suppressing the fire, investigating the fire's cause, and pursuing reimbursement for the expenses it incurred in doing so. CalFire ultimately determined the Sherpa Fire had started on the property of Presbyterian Camp and Conference Centers, Inc. (Presbyterian), when Presbyterian's employee removed a smoldering log from a malfunctioning fireplace in one of Presbyterian's cabins.

Under Health and Safety Code[1] sections 13009 and 13009.1, which permit recovery of expenses from "[a]ny person . . . who negligently . . . sets a fire, allows a fire to be set, or allows a fire kindled or attended by him or her to escape," CalFire sought recovery of its expenses from Presbyterian. Presbyterian demurred, arguing that sections 13009 and 13009.1 do not contemplate vicarious liability and asserting

<hr>

[1]     All further statutory references are to the Health and Safety Code unless otherwise specified.

that — because the fire was not started by an employee's authorized or ratified act or by Presbyterian's failure to act — there was no basis to impose direct liability. The trial court overruled the demurrer, and the Court of Appeal denied Presbyterian's writ petition challenging the trial court's order. (*Presbyterian Camp & Conference Centers, Inc. v. Superior Court* (2019) 42 Cal.App.5th 148, 152 (*Presbyterian*).)

The question before us is whether a corporation like Presbyterian can be held vicariously liable for the cost of suppressing fires that its agents or employees negligently or unlawfully set or allowed to escape. For the reasons discussed below, we affirm the judgment of the Court of Appeal, although our holding answers a narrower question than the one originally presented; we hold that sections 13009 and 13009.1 incorporate the common law theory of respondeat superior. As the parties focused their briefing on this theory and did not comprehensively address other types of vicarious liability, we do not reach the incorporation of vicarious liability generally.[2]

## I.

### A.

In 2016, Presbyterian owned property in rural Santa Barbara County, which it operated as Rancho La Sherpa and

---

[2] As other theories of vicarious liability may implicate considerations not presented by the facts of this case or briefed by the parties here, we decline to comment specifically on those theories.

used to host camps and conferences.[3]  Presbyterian employed Charles Cook to reside at Rancho La Sherpa and oversee its operations.

On June 15, 2016, a fire in the fireplace of one of the Rancho La Sherpa cabins began to fill the cabin with smoke because of a chimney malfunction.  In response to the smoke, Cook transported a smoldering log from the cabin's fireplace to an outdoor firepit.  Burning embers from the log fell onto the dry vegetation surrounding the cabin and ignited a fire.  That fire — the Sherpa Fire — spread rapidly to neighboring properties. Based on its investigation of how the fire began, CalFire concluded that numerous forms of negligence and misdemeanor fire safety violations contributed to the ignition and uncontrolled spread of the fire.  These included the kindling of a fire in a malfunctioning fireplace, the failure to adequately maintain that fireplace, the transporting of a smoldering log over dry vegetation, the failure to clear vegetation within 100 feet of the cabins, the failure to provide smoke detectors, and the failure to provide fire extinguishers or adequate water sources.

By the time authorities managed to fully contain and extinguish the Sherpa Fire a month later, it had consumed 7,474 acres of vegetation and destroyed one structure.  CalFire incurred about $12.2 million in costs relating to suppressing the Sherpa Fire, including investigation and administrative expenses.

---

[3]     Because this action arises from a writ petition challenging the overruling of a demurrer, we take the facts as stated in CalFire's first amended complaint. (See *Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.)

**B.**

The dispute in this case centers around the chapter of the Health and Safety Code entitled "Liability in Relation to Fires." As is relevant here, sections 13007 through 13009.1 of that chapter provide for civil liability relating to fires: sections 13007 and 13008 impose liability for *damages* caused by fires, while section 13009 permits recovery of the *costs of fire suppression*, and section 13009.1 permits recovery of investigation and accounting costs related to the recovery of funds under section 13009. More specifically, section 13007 provides: "Any person who personally or through another wilfully, negligently, or in violation of law, sets fire to, allows fire to be set to, or allows a fire kindled or attended by him to escape to, the property of another, whether privately or publicly owned, is liable to the owner of such property for any damages to the property caused by the fire."

Section 13008 provides: "Any person who allows any fire burning upon his property to escape to the property of another, whether privately or publicly owned, without exercising due diligence to control such fire, is liable to the owner of such property for the damages to the property caused by the fire."

In relevant part, section 13009 provides: "Any person . . . who negligently, or in violation of the law, sets a fire, allows a fire to be set, or allows a fire kindled or attended by him or her to escape onto any public or private property, . . . is liable for the fire suppression costs incurred in fighting the fire and for the cost of providing rescue or emergency medical services, and those costs shall be a charge against that person. The charge shall constitute a debt of that person, and is collectible by the person, or by the federal, state, county, public, or private agency,

4

incurring those costs in the same manner as in the case of an obligation under a contract, expressed or implied."

Finally, section 13009.1 makes "[a]ny person . . . who negligently, or in violation of the law, sets a fire, allows a fire to be set, or allows a fire kindled or attended by him or her to escape onto any public or private property" liable for "[t]he cost of investigating and making any reports with respect to the fire" and "[t]he costs relating to accounting for that fire and the collection of any funds pursuant to Section 13009, including, but not limited to, the administrative costs of operating a fire suppression cost recovery program." (§ 13009.1, subd. (a)(1), (2).)

Sections 13007 and 13008 were last amended in 1953, when the fire liability laws were moved from the Civil Code into the Health and Safety Code. Section 13009, by contrast, has been amended several times since then, most notably — for purposes of our analysis today — in 1971.[4] Prior to 1971, section 13009 cross-referenced both sections 13007 and 13008, making liable for *the costs of fire suppression* any person liable for *damages* under those sections. (See Stats. 1953, ch. 48, § 3, p. 682 ["The expenses of fighting any fires mentioned in Sections 13007 and 13008 are a charge against any person made liable by those sections"].) The 1971 amendment to section 13009 (1971 amendment) replaced the cross-reference to sections 13007 and 13008 with new standalone language that duplicated some, but not all, of the terms of section 13007. (See Assem. Bill No. 1247 (1971 Reg. Sess.) § 1; Stats. 1971, ch. 1202, § 1, p. 2297

---

[4] Section 13009.1 was enacted in 1984. As indicated above, sections 13009 and 13009.1 begin with identical language.

["Any person who negligently, or in violation of the law, sets a fire, allows a fire to be set, or allows a fire kindled or attended by him to escape onto any forest"].) As described below, this case turns on the meaning of those changes: Presbyterian argues that the deletion of the cross-reference to section 13007 and 13008 (together with the fact that the phrase "personally or *through another*" was not replicated in the amended version of section 13009) implicitly eliminated respondeat superior liability. CalFire argues that it did not.

### C.

In the aftermath of the Sherpa Fire, CalFire filed a lawsuit against Presbyterian, Cook, and unnamed Doe defendants, seeking recovery of CalFire's fires suppression and investigation costs pursuant to Health and Safety Code sections 13009 and 13009.1. Presbyterian demurred, relying on *Department of Forestry & Fire Protection v. Howell* (2017) 18 Cal.App.5th 154 (*Howell*) for the proposition that it could not be held liable for a fire indisputably started by Cook and asserting that there was no basis to impose direct liability on the corporation. Presbyterian asserted that CalFire could seek cost recovery only from Cook, the individual employee who carried the smoldering log outside. The trial court overruled the demurrer, distinguishing *Howell* as having disallowed vicarious liability only where such liability would have been premised upon the actions of *independent contractors*; the court concluded *Howell* did not reach the issue of whether vicarious liability could arise out of the actions of *employees or agents*, and it held that the law did contemplate liability in that context.

Presbyterian petitioned for a writ of mandate, which the Court of Appeal denied. (*Presbyterian*, *supra*, 42 Cal.App.5th at

p. 152.)  The court expressly disagreed with the *Howell* majority, adopting instead the position advocated by the *Howell* dissent. (*Ibid.*, citing *Howell*, *supra*, 18 Cal.App.5th at pp. 204–208 (dis. opn. of Robie, J.).)  Reasoning that corporations necessarily act through their agents, the court held that sections 13009 and 13009.1 must contemplate vicarious liability.  (*Presbyterian*, at p. 155.)  The court explained that such liability is a " ' " 'deeply rooted sentiment' " ' in California," which it presumed the Legislature did not depart from silently.  (*Id.* at pp. 155–156, quoting *Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 208 (*Mary M.*) [describing respondeat superior liability].)  Undertaking a lengthy analysis of the historical evolution of civil fire liability statutes in California, the court concluded that nothing in the legislative history indicated a purpose to preclude liability for an employee's negligent or illegal acts. (*Presbyterian,* at pp. 157–162.)

We granted review to resolve the conflict between *Howell* and *Presbyterian* regarding whether or to what extent sections 13009 and 13009.1 incorporate common law theories of vicarious liability (although, as noted above, our holding is ultimately limited to the theory of respondeat superior).  Presbyterian concedes that the pre-1971 version of section 13009 allowed for respondeat superior liability, but it contends that the 1971 amendment to that section eliminated such liability for fire suppression costs.  It argues that because the 1971 amendment to section 13009 deleted the cross-reference to sections 13007 and 13008, and section 13007 refers to conduct by "[a]ny person . . . personally *or through another*" (italics added) (while the amended version of section 13009 did not), the Legislature intended to eliminate respondeat superior liability.

Presbyterian further maintains that while elimination of the cross-reference to sections 13007 and 13008 eradicated respondeat superior liability, the change was also meant to convey that a corporation can still be held *directly* liable under these sections in *some* circumstances: where a fire is started by an authorized or ratified act of the corporation's employees or agents, or by the corporation's failure to act. According to Presbyterian, this elaborate structure, whereby theories of vicarious liability are abolished but direct liability is maintained, can *all* be gleaned simply from section 13009's elimination of the cross-reference to sections 13007 and 13008.

We find Presbyterian's theory to be both an arbitrary interpretation of the law and one that is difficult to apply on a practical basis. As explained below, we are unpersuaded by Presbyterian's contention that the 1971 amendment's elimination of the cross-reference to sections 13007 and 13008 (the first of which contains the phrase "personally or through another"), was intended to effectuate a dramatic change to the state's fire liability regime and thereby eliminate a centuries-old basis of liability. We do not accept that so subtle a textual change was meant to enact such a massive departure from well-settled law, especially where the legislative history contains no indication of such an intent. We are equally unpersuaded that these minor drafting changes, allegedly eliminating respondeat superior liability, were also intended to simultaneously preserve other bases of common law tort liability — again, without any discussion in the legislative history. Such an approach would have been an astonishingly opaque and subtle way to announce a dramatic change.

Presbyterian is ultimately asking us to create an ad hoc doctrine that would effectively limit corporate liability to: (1) negligent acts committed with the direction, authorization, or ratification of some sufficiently high-ranking corporate official; and (2) the corporation's negligent failures to act. And this novel approach to corporate liability, Presbyterian claims, was all determined and announced by merely deleting one statute's cross-reference to another statutory section. We decline to adopt this approach and instead conclude that sections 13009 and 13009.1 continue to incorporate the theory of respondeat superior.[5]

## II.

### A.

Respondeat superior has long been a bedrock doctrine of the common law. (See *Gleason v. Seaboard Ry.* (1929) 278 U.S. 349, 356 ["few doctrines of the law are more firmly established or more in harmony with accepted notions of social policy than that of the liability of the principal without fault of his own"].) For nearly 150 years, the long-standing history of respondeat superior — a form of vicarious liability — has been reflected in both California statutory and common law, pursuant to which, by default, "an employer may be held vicariously liable for torts

---

[5] In their briefing, the parties adopt a convention whereby "section 13009" refers to both section 13009 and section 13009.1 (unless otherwise specified). We agree with the parties' contention that the availability of respondeat superior liability is the same under both sections. While our analysis in this opinion focuses on the effect of the 1971 amendment on section 13009, the ultimate resolution of that inquiry applies to both section 13009 and section 13009.1.

committed by an employee within the scope of employment."
(See *Mary M.*, *supra*, 54 Cal.3d at p. 208; 1872 Civ. Code, § 2338;
Civ. Code, § 2338 ["a principal is responsible to third persons for
the negligence of his agent in the transaction of the business of
the agency"]; *Presbyterian*, *supra*, 42 Cal.App.5th at pp. 155–
156, quoting *Mary M.*, *supra*, 54 Cal.3d at p. 208 [noting that
respondeat superior liability is " ' " 'deeply rooted' " ' " in
California law]; see also, e.g., *Hull v. Sacramento Valley R. Co.*
(1859) 14 Cal. 387 [in suit for damages to burned grain, finding
prima facie case of negligence stated by fact of fire and proof that
passing train would not ordinarily emit fire-causing sparks
absent negligence, making no distinction between negligence of
railroad corporation and that of its employees]; *Wilson v.
Southern Pac. R. Co.* (1882) 62 Cal. 164 [holding railroad
corporation liable for fire damages to stored wool caused by its
warehouse keeper's negligent use of an oil lamp in the keeper's
bedroom, making no distinction between the keeper's negligence
and the corporation's].)

In light of the doctrine's deep history — particularly in fire
liability cases — we conclude that it would not be appropriate to
read respondeat superior out of section 13009 unless the
Legislature had expressed a clear intent to abrogate this
common law doctrine. "As a general rule, '[u]nless expressly
provided, statutes should not be interpreted to alter the common
law, and should be construed to avoid conflict with common law
rules. [Citation.] "A statute will be construed in light of
common law decisions, unless its language ' "clearly and
unequivocally discloses an intention to depart from, alter, or
abrogate the common-law rule concerning the particular subject
matter." ' " ' " (*California Assn. of Health Facilities v.*

*Department of Health Services* (1997) 16 Cal.4th 284, 297 (*Cal. Health*); see also *McMillin Albany LLC v. Superior Court* (2018) 4 Cal.5th 241, 249 ["To the extent possible, we construe statutory enactments as consonant with existing common law and reconcile the two bodies of law. [Citations.] Only ' "where there is no rational basis for harmonizing" ' a statute with the common law will we conclude that settled common law principles must yield."].)

Presbyterian contends that no "clear and unequivocal" expression of legislative intent is necessary to deviate from the long-standing incorporation of respondeat superior into section 13009. Its position is that a public entity's recovery of firefighting costs was created wholly by statute and that, at common law, government entities were not permitted to recover the costs incurred providing a service funded by taxes. (See, e.g., *Howell, supra,* 18 Cal.App.5th at p. 176 ["At common law, there was no recovery of government-provided fire suppression costs; that recovery is purely a creature of statute"]; *City of Los Angeles v. Shpegel-Dimsey, Inc.* (1988) 198 Cal.App.3d 1009, 1020 (*Shpegel-Dimsey*) ["It is well settled that 'an action to recover fire suppression costs [not incurred in protecting one's own property] is a creature of statute' "].[6]) Accordingly,

---

[6] We do not read *Shpegel-Dimsey* as rejecting the incorporation of respondeat superior or other vicarious liability doctrines into section 13009. *Shpegel-Dimsey* states that a public entity's right to recover fire suppression costs is limited to what has been provided by statute; however, that limitation does not foreclose interpreting the statute in a manner consistent with the common law. In other words, while section 13009 provides the sole mechanism by which a public agency

Presbyterian argues that when section 13009 and its predecessor statutes were enacted, there was no relevant common law to alter, conflict with, depart from, or abrogate; therefore there is no need to "reconcile" or "harmonize" section 13009 with the common law theory of respondeat superior, and we need not require "clear and unequivocal" legislative language to excise that theory from the statute.

We are not persuaded. Nothing about a right of action being a creature of statute suggests that it exists on a slate wiped clean of common law principles. (See *People v. Southern Cal. Edison Co.* (1976) 56 Cal.App.3d 593, 603 (*Southern Cal. Edison*) [holding that § 13009 incorporates well-settled principles of compensatory damages, notwithstanding conclusion that the § 13009 recovery right is purely a creature of statute]; see also *Cal. Health, supra*, 16 Cal.4th at pp. 295–296 [concluding that statute incorporated common law liability principles without even inquiring whether the conduct prohibited by the statute — health and safety violations by nursing facilities — had been actionable at common law].)[7]

---

may recover costs associated with fire suppression, the statute — as this opinion ultimately concludes — incorporates at least one basis of common law vicarious liability: the theory of respondeat superior.

[7]     Presbyterian also notes the statute's statement that costs are recoverable in the same manner as in an action for "contract." It argues that this statutory reference to contract law "does not contemplate vicarious liability in the tort sense." However, we have previously explained that the application of procedural rules governing contract actions is independent of the nature of "the statutory obligation for the expense of

Even when a statute does not expressly mention relevant common law principles, where the Legislature creates new tort liability, background tort principles will often be incorporated. (See *Leslie Salt Co. v. San Francisco Bay Conservation etc. Com.* (1984) 153 Cal.App.3d 605, 618–619 ["Where, as here, such legislation does not expressly purport to depart from or alter the common law, it will be construed in light of common law principles bearing upon the same subject"]; cf. *Meyer v. Holley* (2003) 537 U.S. 280, 285 ["when Congress creates a tort action, it legislates against a legal background of ordinary tort-related vicarious liability rules and consequently intends its legislation to incorporate those rules"].)

This court has repeatedly read statutes as incorporating respondeat superior liability even when they do not expressly address the imposition of liability on that basis. (See, e.g., *Kinney v. Vaccari* (1980) 27 Cal.3d 348, 354 [relying on Civ. Code, § 2338 to incorporate the theory of respondeat superior into Civ. Code, § 789.3]; *Hudson v. Nixon* (1962) 57 Cal.2d 482, 484 [same as to Health & Saf. Code, §§ 35700–35741]; *Patterson v. Domino's Pizza, LLC* (2014) 60 Cal.4th 474, 499 [concluding that "traditional common law principles of agency and

---

extinguishing a fire" and of whether that obligation is "classified as one sounding in tort, or a quasi contract, or a liability in the nature of a penalty." (*People v. Zegras* (1946) 29 Cal.2d 67, 68–69; see also *Globe Indem. Co. v. State of California* (1974) 43 Cal.App.3d 745, 749 [concluding that the "contract" reference in § 13009 "merely provides a method whereby fire suppression costs might be recovered, which is governed by the procedure applicable to a suit upon a contract, express or implied, and does not constitute a declaration that the recovery sounds in contract instead of tort"].)

respondeat superior supply the proper analytical framework under [the Fair Employment and Housing Act]" despite no explicit language to that effect in the statute]; *Ford Dealers Assn. v. Department of Motor Vehicles* (1982) 32 Cal.3d 347, 361 [concluding that Veh. Code, § 11713 incorporates the concept of principal-agent liability even though the statute did not identify or reference respondeat superior].)

In light of the enduring importance of respondeat superior in our common law and the conciliatory approach courts take in construing statutory enactments against the backdrop of existing common law, we understand section 13009 as having incorporated the common law theory of respondeat superior. Accordingly, "clear[] and unequivocal[]" legislative intent will be necessary to conclude that the Legislature subsequently eliminated that basis of liability from section 13009. (*Cal. Health*, *supra*, 16 Cal.4th at p. 297.)

**B.**

We now turn to the parties' key disagreement: whether the 1971 amendment provided such an expression of intent, thereby eliminating respondeat superior liability under section 13009.

As explained above, prior to 1971, section 13009 cross-referenced both sections 13007 and 13008, making liable for the costs of fire suppression any person liable for damages under either or both of the two preceding sections: "The expenses of fighting any fires mentioned in Sections 13007 and 13008 are a charge against any person made liable by those sections . . . ." (Stats. 1953, ch. 48, § 3, p. 682.) Section 13007 began (as it still does) with the following language: "Any person who personally or through another wilfully, negligently, or in violation of law,

sets fire to, allows fire to be set to, or allows a fire kindled or attended by him to escape to, the property of another."  In 1971, the Legislature amended section 13009 by replacing the cross-reference to sections 13007 and 13008 with new standalone language.  (See Assem. Bill No. 1247 (1971 Reg. Sess.) § 1; Stats. 1971, ch. 1202, § 1, p. 2297.)  The amended version of section 13009 began with the words:  "Any person who negligently, or in violation of the law, sets a fire, allows a fire to be set, or allows a fire kindled or attended by him or her to escape . . . ."  Presbyterian contends that the Legislature's elimination of the cross-reference to section 13007 (which contains the phrase "personally or through another") and its subsequent omission[8] of that precise phrase in amended section 13009 eliminated respondeat superior liability under section 13009.

For the reasons described below, we reject that conclusion. Neither the plain language of the statute nor the legislative history supports Presbyterian's position.  Moreover, Presbyterian's interpretation of the statutory amendment would undermine the policy goals that motivate the law.

> *1.*

Presbyterian contends that the phrase "through another" (or "personally or through another") is the mechanism that allows for respondeat superior liability under section 13007 and — by an earlier cross-reference to that section — what previously allowed for respondeat superior liability under

---

[8]    Although Presbyterian repeatedly asserts that the Legislature "deleted" the phrase "through another" from section 13009, in reality, the phrase "through another" has never been a part of section 13009.  Accordingly, the phrase was not "deleted" from that section.

section 13009. Presbyterian further contends that the elimination of the cross-reference to section 13007 without replication of the phrase "personally or through another" in the amended version of section 13009 eliminated respondeat superior liability for fire suppression costs. In order for these contentions to persuade, Presbyterian must demonstrate that the phrase "through another" does, in fact, refer to the theory of respondeat superior. It does not succeed in doing so.

First, the phrase "personally or through another" does not contain any of the legal terms of art typically associated with the concept of respondeat superior. It does not mention the terms "servant," "agent," "employee," or "master." (See Rest.2d Agency, §§ 1, 2 [discussing these as key terms in the context of the law of respondeat superior].) Although this fact is not dispositive, using such terms of art would have clearly signaled that the clause referred to the theory of respondeat superior. The absence of such terms would tend to suggest the opposite. (Cf. *People v. Weeren* (1980) 26 Cal.3d 654, 668 [finding that, where Congress "avoided all reference to . . . long established terms of art," it did not invoke the laws associated with those terms]; *Ramirez v. Nelson* (2008) 44 Cal.4th 908, 917–919 [explaining that vicarious liability was expressly imposed in the context of a statute that contained the phrase "either personally or through an employee or agent"].)

Second, Presbyterian predicates its argument on an assumption that "through another" must refer to the principle of respondeat superior. However, the phrase does *not* commonly refer to that principle. Presbyterian points to no other place in the Code where "through another" is used as a shorthand for respondeat superior specifically or for vicarious liability

generally, nor can we find any. Moreover, in other contexts, the phrase is regularly used to refer more generally to situations in which a person (natural or corporate) accomplishes something indirectly or through the use of an intermediary, as opposed to acting alone. (See, e.g., *Pfeifer v. John Crane, Inc.* (2013) 220 Cal.App.4th 1270, 1291, fn. 2 ["Section 388 [of the Restatement Second of Torts] states: 'One who supplies directly or through a third person a chattel for another to use is subject to liability' "]; *City of San Jose v. Superior Court* (2017) 2 Cal.5th 608, 623, quoting *Consolidated Irrigation Dist. v. Superior Court* (2012) 205 Cal.App.4th 697, 710 [" '[A]n agency has constructive possession of records if it has the right to control the records, either directly or through another person' "].) Thus, Presbyterian is wrong to assume that "through another" necessarily refers to respondeat superior. Instead, the phrase "through another" is regularly used to refer to situations in which a person will be held liable because they directed another person to act; the phrase is not employed to impose liability on otherwise blameless parties because of the actions of another person.[9]

---

[9] Likewise, in the criminal context, a person can be convicted of possessing an illegal firearm "directly or through another." (CALJIC No. 12.44 [" 'Constructive possession' does not require actual possession, but does require that a person knowingly exercise control over or the right to control a thing, either directly or through another person or persons"]; see also CALJIC No. 16.040 [same language in the context of the instruction for possession of a controlled substance device]; CALJIC No. 1.24 [same language in the context of the general instruction defining "possession"].) Here, too, the phrase

Third, Presbyterian argues that the omission of the phrase "through another" abrogated only respondeat superior liability and not other forms of liability (like direct liability). But Presbyterian cannot escape that its interpretation of the phrase "through another" would actually abrogate *both* respondeat superior *and* direct corporate liability — the very form of liability that Presbyterian claims has *not* been abrogated. While Presbyterian believes that the phrase "through another" only refers to respondeat superior, the more natural reading of the phrase is one that encompasses a variety of agency situations, including those in which a principal directs an agent to act in a manner determined to be negligent or negligently supervises the agent. To that end, if — as Presbyterian argues — the 1971 Legislature deliberately omitted "through another" from section 13009 in order to preclude the liability established by that phrase in section 13007, the omission would seem to preclude *all* forms of corporate liability, even the *direct* forms of liability that Presbyterian argues the Legislature intended to maintain. That possibility is further proof that mere omission of the phrase "through another" is far from a "clear[] and unequivocal[]" statement by the Legislature that it intended to abrogate respondeat superior liability. (*Cal. Health*, *supra*, 16 Cal.4th at p. 297.)

---

"through another" does not invoke the concept of respondeat superior, pursuant to which an otherwise blameless person is held liable for the actions of another. Instead, the phrase simply refers to situations in which a person facing criminal charges is culpable because they directed or instructed another person to act.

18

Finally, it is also clear that when the Legislature *does* intend to exclude or abolish respondeat superior liability, it knows quite well how to do so explicitly. For example, it can expressly state that a person will not be liable for the actions of others. (See, e.g., § 1371.25 ["A plan, any entity contracting with a plan, and providers are each responsible for their own acts or omissions, and are not liable for the acts or omissions of, or the costs of defending, others"]; Gov. Code, § 820.8 ["Except as otherwise provided by statute, a public employee is not liable for an injury caused by the act or omission of another person"].) The Legislature employed no such language here.[10]

Accordingly, we are not persuaded that the phrase "through another" was used by the Legislature to refer to respondeat superior in section 13007 or that omission of the phrase was intended to excise respondeat superior liability from section

---

[10] The parties also advance arguments about whether section 13008 — which contains the same "[a]ny person who" phrasing as section 13009 — incorporates respondeat superior liability and whether the answer to that inquiry should bear on our analysis of section 13009. However, the parties have not asked us to decide the scope of section 13008 here, nor is the answer to that question necessary for the resolution of this matter. We therefore decline to resolve it.

Instead, we note only that if — as Presbyterian contends — section 13008 does not incorporate respondeat superior liability, it is not because it is missing the words "personally or through another." As discussed above, we reject the contention that the mere presence of the phrase "through another" indicates the availability of respondeat superior liability, while its absence bars it. Accordingly, the fact that section 13008 uses the term "[a]ny person who" rather than "[a]ny person who personally or through another" does not bear on our examination of section 13009.

13009 when it was amended in 1971, let alone that it did so with the scalpel-like precision that Presbyterian asserts. As noted above, in order to depart from or abrogate common law rules, statutory language must " ' " ' "*clearly and unequivocally* disclose[] an intention to" ' " ' " do so. (*Cal. Health, supra,* 16 Cal.4th at p. 297, italics added.) The mere deletion of a cross-reference to section 13007, which in turn contains the phrase "through another," does not in any way manifest a " ' " ' "clear[] and unequivocal[]" ' " ' " intent to abrogate more than a century of common law tort principles. (*Cal. Health*, at p. 297.)

Presbyterian contends that this conclusion relegates the meaning of the phrase "through another" to mere surplusage. How, it asks, can the phrase be anything other than surplusage if its omission does not eliminate respondeat superior liability? In other words, Presbyterian contends that our conclusion about the language used in section 13009 drains any meaning from the phrase "personally or through another" in section 13007. Certainly, our premise when reading statutes is that, as much as possible, every word should add meaning — and no language should serve as mere surplusage. (*Tuolumne Jobs & Small Business Alliance v. Superior Court* (2014) 59 Cal.4th 1029, 1038; see also *In re Jennings* (2004) 34 Cal.4th 254, 273 [" 'where a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject is significant to show that a different legislative intent existed with reference to the different statutes' "].)

But this principle is simply a starting point for our analysis, and we avoid mechanistically applying it where it defeats the manifest statutory purpose. (*People v. Cruz* (1996)

20

13 Cal.4th 764, 782; *People v. Rizo* (2000) 22 Cal.4th 681, 687, quoting *Cruz*, at p. 782 [the rule against surplusage is "only a 'guide[] and will not be used to defeat legislative intent' "]; *People v. Raybon* (2021) 11 Cal.5th 1056, 1070, fn. 10, quoting *People v. Valencia* (2017) 3 Cal.5th 347, 381 (conc. opn. of Kruger, J.) ["Moreover, 'like all . . . interpretive canons, the canon against surplusage is a guide to statutory interpretation and is not invariably controlling' "].) For one thing, the Legislature can use different language to refer to the same ideas. (See *United Riggers & Erectors, Inc. v. Coast Iron & Steel Co.* (2018) 4 Cal.5th 1082, 1093 ["Different bills, drafted by different authors, passed at different times, might well use different language to convey the same basic rule"].) Thus, sections 13007 and 13009 could use different language to refer to the same bases of liability. In addition, even assuming for the sake of argument that our interpretation did render language in section 13007 surplusage, rigid application of the rule against surplusage would defeat the statutory purpose of section 13009, as we explain below. Ultimately, whatever "personally or through another" may mean in section 13007, we cannot conclude that the mere deletion of section 13009's cross-reference to section 13007 evinces a "clear[] and unequivocal[]" legislative intent to eliminate respondeat superior liability. (*Cal. Health, supra,* 16 Cal.4th at p. 297.)

### 2.

The legislative history supports this conclusion. (See, e.g., *Jones v. Lodge at Torrey Pines Partnership* (2008) 42 Cal.4th 1158, 1163, quoting *Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737 [confirming interpretation of the statutory text by examining the legislative

history].)  In 1963, the Court of Appeal decided *People v. Williams* (1963) 222 Cal.App.2d 152, which interpreted section 13009 as precluding recovery of fire suppression costs when a fire burns only on the land of the person who started the fire. (*Williams,* at p. 155.)  At the urging of the California Department of Conservation, the Legislature amended section 13009 in 1971 to hold liable property owners whose fires do not escape their own property lines.

The Legislative Counsel's Digest makes clear that responding to the *Williams* holding was the primary purpose of the 1971 amendment.  The final legislative digest summary for Assembly Bill No. 1247 (Reg. Sess.) stated that it:  "Provides that the expenses of fighting a fire are a debt of the person who negligently, or unlawfully sets the fire, allows it to be set, kindled, or to escape onto any forest, range or nonresidential grass-covered land, rather than providing such liability only where the fire damages the property of another." (Legis. Counsel's Dig., Assem. Bill No. 1247, 3 Stats. 1971 (1971 Reg. Sess.) Summary Dig., p. 173; accord *People v. Southern Pacific Co.* (1983) 139 Cal.App.3d 627, 637 (*Southern Pacific*) [concluding that the 1971 amendment was a reaction to the holding in *Williams*]; see also Assem. Com. on Judiciary, Analysis of Assem. Bill No. 1247 (1971 Reg. Sess.) May 3, 1971, p. 1 [analysis & proposed amendment; "Health & Safety C §§ 13007–13009 provide that any person is liable for damages caused to <u>another's</u> property on account of his negligently attended or started fires.  The costs of fire suppression on such victim's property is also chargable [*sic*] against the fire starter. [¶]  AB 1247 makes a person who willfully, negligently or unlawfully burns <u>his</u> property liable for fire suppression

expenses."[11]]; Dept. of Conservation, Enrolled Bill Rep. on Assem. Bill No. 1247 (1971 Reg. Sess.) prepared for Governor Reagan (Oct. 20, 1971) p. 1 ["Public agencies are presently prevented from recovering fire suppression costs incurred on forest fires which do not escape from the property of origin. This creates an inequality in favor of the very large property owner. Recovery of major suppression costs is, in some cases, based on ownership pattern rather than irresponsible acts"].[12]) The fact that the Legislature was focused on *expanding* liability in response to the *Williams* decision undermines Presbyterian's argument that the 1971 amendment also sought to abolish respondeat superior — a change that would have been a significant curtailment of liability.

Presbyterian counters by arguing that responding to *Williams* was not the *only* purpose of the 1971 amendment. The amendment also restricted recovery in two specific ways. First, it narrowed section 13009 so that it applied only to fires that "escape[d] onto any forest, range or nonresidential grass-covered land." (Stats. 1971, ch. 1202, § 1, p. 2297.)[13] Second, it limited

---

[11]    The word "willfully" was subsequently struck from the text of the statute.

[12]    (*Elsner v. Uveges* (2004) 34 Cal.4th 915, 934, fn. 19 ["we have routinely found enrolled bill reports, prepared by a responsible agency contemporaneous with passage and before signing, instructive on matters of legislative intent"].)

[13]    In 1982, this part of section 13009 would be broadened again so that it was no longer limited to forest, range, or nonresidential grass-covered land. (See Stats. 1982, ch. 668, §1, p. 2738.) After that amendment, section 13009 covered fires on

liability for firefighting expenses where someone merely allowed a fire to spread but had no involvement in starting it. (See *Southern Pacific, supra,* 139 Cal.App.3d at p. 637.)

Presbyterian points to the inclusion of these two restrictions as support for the contention that the 1971 amendment abolished respondeat superior liability as well, suggesting that the Legislature intended to curtail corporate liability at the same time (by eliminating a significant means of imposing negligence liability on corporations). This argument is unavailing. The available legislative history for the 1971 amendment reveals no discussion whatsoever of the elimination of respondeat superior liability specifically or vicarious liability generally. Not a single document mentions or refers to what would have been a very significant change to the law. Moreover, the legislative history *does* address the two other changes in the 1971 amendment that restricted the existing bases for recovery. (See, e.g., Sen. Com. on Judiciary, Analysis of Assem. Bill No. 1247 (1971 Reg. Sess.) as amended July 19, 1971, pp. 2–3.) Analysis provided by the Senate Committee on Judiciary explicitly noted that the 1971 amendment would "[r]equire[] that a fire which is kindled or attended by a person escape onto any forest, range, or nonresidential grass-covered land, <u>rather</u> <u>than</u> <u>any</u> <u>land</u>, before any liability for such expense may be imposed" and that it would "[e]liminate[] any liability for such expense in any case in which a person allows a fire burning on his property to escape to the property of another

---

"any public or private property," not just "forest, range or nonresidential grass-covered land." (*Ibid.*)

24

without exercising due diligence to control the fire." (*Ibid.*) By contrast, the analysis did not mention changes to the availability of respondeat superior liability. (*Ibid.*)

Presbyterian argues that "[t]he fact legislative history materials do not reflect discussion on a particular topic does not necessarily mean the Legislature did not intend to change the law." (*Hayes v. Temecula Valley Unified School Dist.* (2018) 21 Cal.App.5th 735, 753; see also *ibid.* ["The objective manifestation of the legislative intent (the words of the amended statute) controls over silence in the legislative history record"].) True. But we do not think an amendment principally aimed at *expanding* liability simultaneously effectuated a significant curtailment of corporate liability without a single comment or any explanation. (See *Apple Inc. v. Superior Court* (2013) 56 Cal.4th 128, 146 ["what *is* clear from the legislative history is that the . . . amendment was enacted to address a very specific problem"]; see also, e.g., *Riverside County Sheriff's Dept. v. Stiglitz* (2014) 60 Cal.4th 624, 647 ["It is doubtful that the Legislature would have instituted such a significant change through silence"]; *Gong v. City of Rosemead* (2014) 226 Cal.App.4th 363, 375 ["We submit that if the Legislature desired to enact such a major change . . . , it would have clearly stated so"].) This is especially so since, as discussed above, the legislative history expressly describes the two other ways in which the 1971 amendment restricted liability but says nothing about the purported third restriction that Presbyterian claims was also enacted. Finally, our interpretation, one that concludes that the 1971 amendment did not subtly and without discussion effectuate a significant curtailment of corporate liability, is wholly consistent with one of the statute's manifest

purposes: to assist the state in covering the potentially astronomical costs of providing fire suppression services.

### 3.

Statutes should be interpreted to be "consistent with legislative purpose and not evasive thereof." (*Cal Pacific Collections, Inc. v. Powers* (1969) 70 Cal.2d 135, 140, citing *Kusior v. Silver* (1960) 54 Cal.2d 603, 620; see also *City of Poway v. City of San Diego* (1991) 229 Cal.App.3d 847, 858 ["We seek to ascertain the intent of the Legislature so as to effectuate the apparent purpose of the law"].) The fact that the elimination of respondeat superior liability would hinder the policy goals of section 13009 reinforces why Presbyterian's argument must fail. A central goal of the statute was clearly to reimburse governmental agencies for the cost of firefighting. In light of that legislative objective, it would make little sense to remove one of the primary forms of corporate liability for negligence: respondeat superior.

Certainly, the Legislature has committed to providing taxpayer-funded fire suppression services where necessary — it made that policy decision long ago. (*Howell, supra,* 18 Cal.App.5th at p. 176, citing *Shpegel-Dimsey, supra,* 198 Cal.App.3d at p. 1020.) However, taxpayer funds are collected to pay for the suppression of "those *inevitable fires which are bound to occur*." (Wylie & Schick, A Study of Fire Liability Law (1957) pp. 11–12, italics added.) Thus, the Legislature has also determined that taxpayers should not be required to "subsidize individual negligence, carelessness, or breach of duty" by footing the bill for fires negligently started. (*Ibid.*) Accordingly, it is hard to see how the position advanced by Presbyterian could be understood as consistent with the Legislature's policy goal of

cost recovery that underpins section 13009.[14]  Employers are more likely than their employees to have the funds or insurance necessary to reimburse the state for fire suppression expenses, and applying respondeat superior liability equitably shifts losses from taxpayers to the enterprises that benefitted from creating the risks that gave rise to the wildfires.[15]  Importantly, corporate activity has historically been a significant contributor to major fires in California.  (See, e.g., *Howell*, at p. 163 [timber

---

[14]    On the topic of cost recovery, we also note that an enrolled bill report contained in the legislative history of the 1971 amendment to section 13009 discussed the anticipated fiscal impact of the amendment.  Under a section entitled "Fiscal Analysis," the enrolled bill report notes only that the amendment "[c]reates potential liability of about $250,000 annually for fire suppression work that would be recovered by the State."  (Dept. of Conservation, Enrolled Bill Rep. on Assem. Bill No. 1247 (1971 Reg. Sess.) prepared for Governor Reagan (Oct. 20, 1971) p. 1.)  There is no mention — as one might expect there would be for an amendment that eliminated a major form of corporate liability — of potential revenue losses or any increased fiscal liability for the state.

[15]    Presbyterian contends that liability under a theory of respondeat superior would "create an exposure out of all proportion to what anyone could sensibly plan for" and would be impossible to anticipate or budget for.  It must be noted, however, that concepts of proportionality, reasonableness, and fairness are already incorporated into the theory of respondeat superior.  (See, e.g., *Southern Cal. Edison*, *supra*, 56 Cal.App.3d at p. 605 ["the proper measure for determining 'expense' incurred for fighting fires pursuant to section 13009 requires that (1) the expense claimed be incurred in fighting the fire, (2) that said expense be the proximate result of defendant's wrongful conduct, and (3) that said expense be reasonably incurred"].)

operator and others]; *Shpegel-Dimsey*, at p. 1015 [plastics company]; *County of Ventura v. So. Cal. Edison Co.* (1948) 85 Cal.App.2d 529, 539 (*County of Ventura*) [electric company]; *Southern Pacific*, *supra*, 139 Cal.App.3d at p. 631 [railroad company].) Under Presbyterian's preferred interpretation, taxpayers would be made to subsidize negligent behavior — contrary to the Legislature's intention — whenever an individual employee who negligently started a fire (while acting within the scope of their employment) is unable to pay the cost of fire suppression.

Another legislative goal behind section 13009 was "to stimulate precautionary measures aimed at preventing the starting and spreading of fire, and thereby eliminate needless conflagrations destructive of property and dangerous to the safety and welfare of the public." (*County of Ventura*, *supra*, 85 Cal.App.2d at p. 539.) This objective would also be well served by the application of respondeat superior, as one of the central rationales behind the doctrine is to prevent recurrence of the tortious conduct. (See *Mary M.*, *supra*, 54 Cal.3d at pp. 208–209; *Perez v. Van Groningen & Sons, Inc.* (1986) 41 Cal.3d 962, 967–968 (*Perez*); *Hinman v. Westinghouse Elec. Co.* (1970) 2 Cal.3d 956, 960 (*Hinman*).) With the application of respondeat superior, employers will have greater incentives to take measures to prevent employee negligence that may start wildfires, such as through better employee training or safer premises maintenance. (Cf. *Pacific Mutual Life Insurance Co. v. Haslip* (1991) 499 U.S. 1, 14 ["Imposing liability without

independent fault [i.e., for fault by an agent] deters fraud more than a less stringent rule"].)[16]

It is also notable that the Legislature defined the term "person" — as that term refers to the entities that may be held liable for fire suppression costs — to include corporations. (§ 19.)  This definition indicates a general intention to impose liability for fire suppression costs onto corporations. Presbyterian contends that section 19 means nothing more than

---

[16]  In addition, the other rationales behind the doctrine of respondeat superior are also aligned with the legislative goals behind section 13009.  The rationales behind the doctrine are (a) to prevent recurrence of the tortious conduct, (b) to give greater assurance of compensation to those who have suffered a loss, and (c) to ensure that the agency's and taxpayers' losses will be equitably borne by those who benefit from the enterprise that gave rise to the costs.  (See *Mary M., supra,* 54 Cal.3d at pp. 208–209; *Perez, supra,* 41 Cal.3d at pp. 967–968; *Hinman, supra,* 2 Cal.3d at p. 960; see also *Johnston v. Long* (1947) 30 Cal.2d 54, 64 ["The principal justification for the application of the doctrine of *respondeat superior* . . . is the fact that the employer may spread the risk through insurance and carry the cost thereof as part of his costs of doing business"].)

Presbyterian asserts that "[t]he common law goal of spreading the burden of loss should not apply in this context because the agencies are not victims needing compensation for injury."  By enacting sections 13009 and 13009.1, however, the Legislature has made a policy decision that the agencies and taxpayers *are* victims and that they are entitled to compensation when public funds are used to suppress fires that result from negligent actions.  (See §§ 13009–13009.1.)  In fact, the key consequence of section 13009 is shifting fire suppression costs away from taxpayers, and Presbyterian's interpretation would undermine that outcome by dramatically exempting corporations (and other noncorporeal entities) from the statute's reach.

that corporations can be held directly liable for fire suppression costs and that Presbyterian's theory of liability does not contravene a definition of "persons" that includes corporations. Vicarious liability and respondeat superior are, however, long-standing and well-established means of imposing liability on corporations. Thus, the legislative intent of holding a corporation liable for losses that "foreseeably result from the conduct of the enterprise" and which therefore should "be allocated to the enterprise as a cost of doing business" (*Farmers Ins. Group v. County of Santa Clara* (1995) 11 Cal.4th 992, 1004) would be ill served by the elimination of respondeat superior liability in section 13009. While it would not be *impossible* to hold corporations liable under Presbyterian's proposed approach, it would significantly curtail corporate liability, which would be in tension with the Legislature's intent of imposing liability for fire suppression costs onto corporations.

In addition, Presbyterian's "interpretation of the statute would [also] give rise to incongruous results" when it comes to imposing liability on corporations. (*Cal. Health*, *supra*, 16 Cal.4th at p. 300.) For example, if Presbyterian were a small "mom and pop" shop whose owners (and officers) were responsible for carrying out the camp's day-to-day operations, then for the same negligent act of carrying a smoldering log outdoors, Presbyterian *would be* held liable. (Accord, *ibid.*) But because Presbyterian is not such a small organization and because it was an employee who performed the negligent act, Presbyterian would escape liability. (*Ibid.*) Such an interpretation, favoring large corporations over small operations, would create odd consequences. Part of the rationale for imposing respondeat superior liability is to encourage

businesses to take additional precautionary measures and to place losses on those better able to bear their costs. (See *Perez, supra,* 41 Cal.3d at p. 967.) Larger organizations will often have more resources at their disposal; accordingly, they will often be better positioned to undertake preventative efforts and compensate firefighting entities. Presbyterian's interpretation would turn this reasoning on its head.

Presbyterian's argument also ignores the practical realities and challenges of holding corporations liable for their actions. Because a corporation is a legal fiction, it cannot act but through the agency of natural persons. (*Cal. Health, supra,* 16 Cal.4th at p. 296 ["regardless of the precise form of ownership, corporate [entities] can only act through their agents and employees"]; *Snukal v. Flightways Manufacturing, Inc.* (2000) 23 Cal.4th 754, 782 [" 'corporations necessarily act through agents' "].) While Presbyterian's proposed interpretation of section 13009 contemplates the imposition of at least some forms of direct corporate liability, it ignores the fact that it can be difficult to prove that a corporation is directly liable for the actions of its employees or agents. (See Rest.3d Agency § 2.01, com. e, p. 85; *id.,* § 1.03, com. c, pp. 58–62.) To prove such liability, a plaintiff must be able to demonstrate authorization by the corporation, usually in the form of direct instructions or a written job description, which may not be possible (and would undoubtedly entail a burdensome inquiry). (See Rest.3d Agency § 2.01, com. e, p. 85; *id.,* § 1.03, com. c, pp. 58–62.) As a result, respondeat superior can serve an important function: it can allow a plaintiff to proceed against a corporation that could have been liable under a burdensome direct liability theory, but to do so under an alternate theory that presents

fewer obstacles to the plaintiff's ability to prove entitlement to relief. Through section 13009, the Legislature intended to compensate taxpayers for the cost of suppressing fires that were negligently started, so the eradication of a long-standing method of establishing corporate liability would have been inconsistent with that legislative purpose.

The cases cited by Presbyterian do not assuage these concerns. It points to *Southern Pacific*, *County of Ventura*, and *Giorgi v. Pacific Gas & Elec. Co.* (1968) 266 Cal.App.2d 355 as examples of cases in which corporations were found directly liable for their actions or failures to act. However, these cases do not discuss the basis upon which the corporations were found liable; they did not have to: respondeat superior would have provided a basis for corporate liability, even if actual authorization or ratification did not. The courts in those cases did not have to engage in the difficult task of determining the precise basis upon which liability would be imposed upon the defendant corporations; if the corporations had authorized the conduct, they would be directly liable for the damages caused, and if they had not authorized the conduct, they would be liable under a theory of respondeat superior. Under Presbyterian's preferred interpretation of section 13009, however, courts would be forced to engage in precisely this type of arduous inquiry, and its adoption would undoubtedly result in a curtailment of corporate liability. Such an outcome would undermine the goals the Legislature sought to pursue through section 13009.

To the extent that Presbyterian believes the wildfire context requires a different balancing of policy goals, it may address its concerns to the Legislature, which has made deliberate decisions about how to allocate risks and balance

competing interests in this arena. (See *Lonicki v. Sutter Health
Central* (2008) 43 Cal.4th 201, 215 ["Those concerns raise issues
of policy that should be addressed to the Legislature rather than
this court, whose task is limited to construing the laws enacted
by the Legislature"].)

## III.

Health and Safety Code sections 13009 and 13009.1 allow
CalFire to recover the taxpayer dollars it spends on fighting and
investigating wildfires that were caused by human negligence.
For the reasons set forth above, we hold that sections 13009 and
13009.1 incorporate the common law theory of respondeat
superior.[17] To decide otherwise would misread the plain
language of the statutes enacted by the Legislature, undermine
the legislative history, and cast aside the goals and purposes
that underpin the statutes at issue. Accordingly, we affirm the
judgment of the Court of Appeal and remand for further
proceedings not inconsistent with this opinion.

The stay of proceedings previously issued by this court is
dissolved.

---

[17] We disapprove *Department of Forestry & Fire Protection v.
Howell, supra,* 18 Cal.App.5th 154 insofar as it sets forth a
contrary rule.

**GROBAN, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**JENKINS, J.**
**MAURO, J.***

---------------------------

\*      Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Presbyterian Camp and Conference Centers, Inc. v. Superior Court

———————————————————————————————

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 42 Cal.App.5th 148
**Review Granted (unpublished)**
**Rehearing Granted**

———————————————————————————————

**Opinion No.** S259850
**Date Filed:** December 27, 2021

———————————————————————————————

**Court:**  Superior
**County:**  Santa Barbara
**Judge:**  Thomas P. Anderle

———————————————————————————————

**Counsel:**

Daley & Heft, Lee H. Roistacher; Brockman Quayle Bennett, Robert W. Brockman, Jr., Garrett A. Marshall; Horvitz & Levy, Beth J. Jay, H. Thomas Watson and Daniel J. Gonzalez for Petitioner.

No appearance for Respondent.

Xavier Becerra and Rob Bonta, Attorneys General, Michael J. Mongan, State Solicitor General, Janill L. Richards, Principal Deputy State Solicitor General, Robert W. Bryne, Assistant Attorney General, Samuel T. Harbourt, Deputy State Solicitor General, Gary E. Tavetian, Ross Hirsch, Jessica Barclay-Strobel and Caitlan McLoon, Deputy Attorneys General, and Kristin A. Liska, Associate Deputy State Solicitor General, for Real Party in Interest.

Downey Brand, William R. Warne, Michael J. Thomas, Annie S. Amaral and Meghan M. Baker for Sierra Pacific Industries and California Forestry Association as Amici Curiae.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Daniel J. Gonzalez
Horvitz & Levy LLP
3601 West Olive Avenue, 8th Floor
Burbank, CA 91505
(818) 995-5817

Samuel Harbourt
Deputy State Solicitor General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
(415) 510-3919